IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LAWRENCE STEWART,                                    Case No.:

     Plaintiff,

v.

BREVARD COUNTY, FLORIDA,

     Defendant.

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

### A. **General Allegations**

1. Plaintiff, Lawrence Stewart ("Stewart") is an individual and a citizen of the State of Florida.

2. Defendant, Brevard County is a State of Florida charter county ("the County") that may be served pursuant to 48.111 Fla. Stat.

3. This is an action brought under 42 U.S.C. § 1983 for damages arising out of a denial of equal protection of the law; denial of procedural due process; and denial of substantive due process as a result of the arbitrary and capricious application of inapplicable ordinances through a series of *de facto* ordinance amendments that are unlawful legislative acts of the County which have deprived Mr. Stewart of his statutory property rights to access the Property,

1

and to erect a residential dwelling on that Property.

4. This is also an action brought under 42 U.S.C. § 1983 for a temporary taking without just compensation in violation of the takings clause of the Fifth Amendment to the United States Constitution, and for mandatory permanent injunction to force the County to allow Mr. Stewart to file a building permit application under applicable County ordinances without imposing conditions amounting to *de facto* amendments of inapplicable ordinances.

5. This Court has jurisdiction in accordance with 28 U.S.C. § 1343 and the takings clause of the Fifth Amendment to the United States Constitution.

6. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to these claims occurred in this district, specifically in Brevard County, Florida which is within this district.

7. All conditions precedent and available administrative remedies have been exhausted or have occurred as described in the Complaint, below.

8. All of the Ordinances discussed in this Complaint, with the exception of the building code provisions in Chapter 22 of the Brevard County Code, appear in Chapter 62 of the County Code, which bears the heading "Land Development Regulations."

2

### B. <u>Factual Allegations: The Property and Access Road</u>

9. On December 3, 2021, Stewart acquired the 4.9-acre m.o.l. parcel ("the Property") a description of which is set forth in a deed recorded in the official records of Brevard County, Florida.  A copy of that deed is attached as **Exhibit A** to the original Complaint.

10. The Property was created when a single 9.9-acre m.o.l. parcel was divided into two parcels consisting of the 4.9 acre m.o.l. parcel purchased by Mr. Stewart, and a 5.0 acre m.o.l. remainder parcel retained by the seller.

11. The Property is located in an agricultural and rural residential area of Brevard County, Florida.

12. The Property has a Future Land Use of Residential 1 and a zoning of AU (minimum 2.5 acre lots), both of which permit the erection of a single-family dwelling as a use of the Property.

13. The principal access to Mr. Stewart's property has been an existing unpaved access road approximately 645 ft. in length, m.o.l. ("the access road") that abuts a portion of the Property and one other abutting vacant 5-acre, m.o.l. parcel.

14. The access road has been in existence since at least since 1967 and likely before that time.

15. Based on a recent survey of the Property performed at the insistence of the

County and at Mr. Stewart's expense, as well as a survey maintained in County building permit records for 5835 Dixie Way which abuts Mr. Stewart's property to the west, the access road lies within a 1,300 ft. long, 30 ft. wide right of way dedicated to and accepted by Brevard County when the County Commission approved the Bryan and Carlile plat approved by the County Commission in 1937, as recorded in County plat book 8 at page 48. A county has no authority, after accepting designation of a public road to disclaim responsibility for maintenance of that road except by following the formal statutory abandonment procedure. *Jordan v. St. Johns County*, 63 So. 3d 835 (Fla. 5th DCA 2011) (citing Ecological *Development, Inc. v. Walton County,*558 So. 2d 1069 (Fla. 1st DCA 1990). Here, there has been no formal abandonment.

16. The access road intersects Dixie Way, a County-maintained road, to the west of the Property, which also appears on the 1937 plat.

17. The Property is located approximately 628 ft. east of the intersection of the access road and Dixie Way. A Brevard County Property Appraiser's map showing the location of the Property, abutting the access road within the County right of way is attached as **Exhibit B** to the original complaint.

18. According to County Public Works Department records, the County has been maintaining Dixie Way since at least April 27, 1976.

19. Because Dixie Way is also dedicated under the Bryan and Carlile plat, Florida law provides that the dedication of 30 ft. County right of way containing the access road was accepted by the County as a county right of way at the time county maintenance began on Dixie Way.

20. Pursuant to Fla. Stat. 95.361(3)(b), the access road is statutorily dedicated because the plat map depicting Mr. Stewart's property and the access road, (plat book 8, page 48, public records of Brevard County), contains a dedication which recites, "surveyed and platted and do hereby dedicate this plat and the roads and streets shown thereon to the perpetual use of the public." This plat approval is then signed by both the Chair and the Clerk to the Brevard County Board of County Commissioners and filed in the Office of the Clerk of the Circuit Court of Brevard County, April 19, 1937 and thus, recorded in the official records of Brevard County. Furthermore, Fla. Stat. 335.01(1) goes on to state, "All roads which are open and available for use by the public and dedicated to the public use, according to law or by prescription, are hereby declared to be, and are established as, public roads."

21. The access road has, in fact, been privately maintained. However, *Moquin v. Brevard County,* 05-2007-CA-006251 (Fla. 18th Cir. 2007) recorded in the Official Records of Brevard County, Florida at Book 5906, Page 5992, the

Court found that the road was considered a county-maintained road. One interesting consideration the Court made though was that the roadway in that case "appeared to be used by the public, telephone poles in place, drainage ditches support an acceptance by the county." These exact points also apply to the roadway outside of the Property here. It is absolutely open and in use by the public. Telephone poles are in place providing electric utility along my roadway from Dixie Way and traveling as far as my east property boundary. And there is a Brevard County Public Works stormwater drainage structure, existing primarily within the boundary of this roadway, which is routinely maintained by Brevard County.

22. According to the Property Appraiser map of the area and records provided by the County Clerk to the Board, on April 11, 1995, well before Mr. Stewart purchased the Property, the County vacated a 374 ft. length of the 30ft. County right of way starting at approximately 325 ft. east of the easternmost boundary of the Property then running approximately 374 ft. to the east.

23. The vacated portion of the right of way reverted to abutting property owners other than Mr. Stewart.

24. There are only four 5-acre m.o.l. vacant parcels of land, including Mr. Stewart's Property, abutting the County right of way within which the 645

6

ft. privately maintained access road exists.

25. The access road within the 1,300 ft. County right of way is approximately 1,260 ft. in length terminating approximately 325ft. from the easternmost boundary of Mr. Stewart's Property.

26. As a result, the County's 30 ft. right of way is now a west to east "right of way to nowhere" terminating at a "flag stem" easement over private property located 325 ft. to the east of the Property.

## C. <u>Factual Allegations: The Waiver Request</u>

27. Since December 3, 2020, Mr. Stewart has been in contact with Brevard County administrative staff to determine whether a single-family residence could be constructed on the Property.

28. Mr. Stewart was told by County staff that, to obtain a building permit, he would have to first obtain a waiver from a 50 ft. road width requirement under the County's unpaved road agreement ordinance, which appears as subsection §62-102(c) of §62-102 in the County Code of Ordinances. The text of §62-102(c) can be found within §62-102 in **Exhibit C** attached to the original complaint.  The entire contents of §62-102 can also be located online in ARTICLE II. - ADMINISTRATION AND ENFORCEMENT | Code of Ordinances | Brevard County, FL | Municode Library

29. Mr. Stewart was led to believe by County staff that such waivers were

routinely granted.

30. To date, the County continues to deny Mr. Stewart's request for a waiver and has been denied a waiver by the County.

### D. Factual Allegations: The October 26, 2021 Waiver Hearing

31. While he had the Property under contract for purchase from the owner, Mr. Stewart paid a $791.95 filing fee to the County when he, in good faith reliance on the County staff interpretation of §62-102(c), filed an application for a waiver of the 50 ft. width requirement set forth in §62-102(c) of the Code, the County's unpaved road agreement provision.

32. Mr. Stewart's waiver request was not approved or denied by the County Manager or his designee, as contemplated under §62-102(c). On October 26, 2021 but, instead, was placed on the County Commission agenda for October 26, 2021.

33. On October 26, 2021, Mr. Stewart appeared before the Brevard County Commission and the Commission commenced a public hearing on his request for waiver.

34. The Brevard County Clerk's summary in the minutes of that meeting indicates that the District 1 Commissioner expressed her concern about the ability of emergency vehicles to reach land-locked property in this rural area of her District. The Commissioner's comments are recorded in the

October 26, 2021 Commission meeting minutes (excerpt attached as **Exhibit**

**D** to the original complaint, and those minutes mistakenly refer to Mr.

Lawrence Stewart as 'Mr. Lawrence').

35. The District 1 Commissioner's comments were, in part, summarized in the

minutes as follows:

> "...there are all these properties there and there is typically one guy who owns the majority and is subdividing them all; he is land-locking them when he does this; the problem is the County trying to get access to those properties, especially with emergency vehicles, to handle the growth out there."

36. The October 26, 2021, County Commission meeting minutes also reflect that

the District 1 Commissioner/Chairperson exchanged comments about

asphalt millings added to the access road. That exchange was summarized

in the minutes as follows:

> "...she has great concerns because someone out there has put millings on the County's right-of-way after she had made it clear to not mess with it right now.
>
> Mr. Lawrence responded he does not know where the millings came from, obviously he did not do that.
>
> Chair Pritchett stated she knows."

37. Chair Pritchett personally filed a Code Enforcement violation report with

Brevard County Code Enforcement in September 2021 relating to the

deposit of asphalt millings on the privately maintained unpaved road,

which exceeded her authority as a county commissioner and brought a personal vendetta into her official duties.

38. Yet, a County fire inspector subsequently came out to check the access road and provided Mr. Stewart with a January 6, 2022, email indicating the road could be used by emergency vehicles in the event of an emergency, as it existed, although he suggested adding asphalt millings to bring the road into compliance with the Fire Code. A copy of that email is attached as **Exhibit E** to the original complaint.

39. The October 26, 2021, Brevard County Commission meeting minutes also reflected that:

    a. the County knew that the owners of two other homes on the access road had connected their driveways to the existing access road as their only point of access;

    b. the District 1 Commissioner and Chairperson, in whose district the Property is located, "liked the idea" of Mr. Stewart buying land from a neighbor or neighbors to provide the 25ft. wide easement that would be required to allow him to have a "flag stem" that would allow him to construct his home on a flag lot, as opposed to using the access road;

    c. the District 1 Commissioner and Chairperson:

> "…reiterated if Mr. Lawrence is willing to table this, it will allow him time to provide County staff with engineering plans showing how the road can be constructed within the 30-foot right-of-way, with additional easements of this right-of-way, including necessary improvements, road drainage, and utilities."

d. the Commission was informed that Mr. Stewart had been trying to get that engineering for three or four months, and had been actively pursuing it;

e. the District 1 Commissioner and Chairperson considered the division of the 9.9-acre parcel creating Mr. Stewart's 4.9-acre parcel and another 5.0-acre parcel to be a subdivision. Specifically, the following exchange between the District 1 Commissioner/Chairperson and Mr. Stewart appears in the minutes, starting with a statement by the District 1 Commissioner:

> "…it is typically one guy who is subdividing all his property and making this mess.
>
> Mr. Lawrence (*sic*) advised he is not involved in that situation.
>
> Chair Pritchett commented she knows.
>
> Mr. Lawrence (*sic*) continued by saying the parcel that he is purchasing is not being subdivided by the definition of State statute, it is not a subdivision.
>
> Chair Pritchett noted she disagrees with him on that…"

f. the District 1 Commissioner/Chairperson informed Mr. Stewart the waiver would not be approved that day;

g. that under the County Code, to build a home on an AU property, it had to be connected to a County road or a flag lot.

40. The Commission then voted to table Mr. Stewart's October 26, 2021, hearing on his request for a waiver from the §62-102(c) requirement for a 50ft. right of way.

41. The October 26, 2021 minutes reflect the formal motion and action by the County Commission on Mr. Stewart's waiver application as follows:

> "The Board tabled consideration of a waiver to the Code of Ordinances of Brevard County, Section 62-102(c) to allow construction of a house at Tax ID 2004427 without constructing an unpaved road within County right-of-way, providing for the maintenance of said roadway, and agreeing to a proportion share assessment for the paving of the roadway to provide time for the applicant to provide County staff with engineering plans showing how the road can be constructed within the 30 foot right-of-way, with additional easements of the right-of-way including necessary improvements, road drainage, and utilities; and this will provide staff the administrative authority, at that time, to review and approve the plans, if appropriate, including a waiver of engineering standards."

42. None of those conditions are set forth or authorized in the unpaved road agreement ordinance, §62-102(c) of the County Code and the Commission, as a legislative body imposing such conditions, engaged in adoption of a *de facto* amendment to §62-102, which requires formal a legislative amendment in accordance with the procedures established by Florida law.

### E. Factual Allegations: Mr. Stewart's Efforts to Comply

43. It was not until sometime in 2022, well after the October 26, 2021,

Commission meeting, that Mr. Stewart discovered that §62-102, in its entirety, does not apply at all in his circumstances (as more particularly presented in the Factual Allegations in section F, below).

44. Before that discovery, in good faith reliance on the County's interpretation of §62-102(c), Mr. Stewart proceeded as if that Ordinance did apply by attempting to comply with the County Commission's *de facto* legislative action purporting to impose procedures, conditions and standards not set forth in §62-102(c).

45. If §62-102 had applied, only three substantive design standards for obtaining an unpaved road agreement had to be met to allow Mr. Stewart to apply for a building permit for a single-family home, which conditions appear in the Code as follows:

  a. "agreements shall be limited to existing county rights-of-way of at least 50 feet in width", absent which the applicant must acquire the necessary easements to meet that requirement or a waiver.

  b. agreements apply to "[o]nly those properties within 1,320 feet of a county-maintained roadway"; and

  c. "[t]he roadway shall be designed and stabilized to a minimum of between LBR 40 and 60."

46. The Property meets the 1,320 ft. standard, being located 650 ft. m.o.l. from

13

Dixie Way, a County maintained right-of-way.

47. In good faith and at his own expense Mr. Stewart obtained a density and compaction test that demonstrated the access road's compliance with the LBR standard set forth in §62-102(c) of the Code.

48. The only design standard identified in §62-102(c) of the Code not met by Mr. Stewart's property is the 50ft. road right-of-way requirement for which the waiver was sought.

## F. Factual Allegations: Inapplicability of §62-102 and County Unpaved Road Design Standards to Mr. Stewart's Property

49. On January 12, 2010, the County Commission had adopted a "legislative intent" authorizing the County staff to prepare amendments to the Ordinance (§62-102). The "legislative intent" approved by the Commission contained the following description of approved changes to §62-102:

> "Article II, Section 62-102 would continue to address the issuance of building permits for ***existing lots*** abutting private roads or unpaved roads, and for ***existing lots*** accessing public roads through ingress/egress easements or flag stems. ***The proposed code changes remove the allowance to create new lots from Chapter 62-102 and, instead, addresses all divisions of land in Article VII, Subdivisions***."
> (*Emphasis supplied*)

50. The October 12, 2010, agenda item at which the revision to §62-102 was approved contained the following description of the effect of the amendments to that ordinance:

14

"Article II, Section 62-102 continues to address the issuance of building permits for *underline existing lots* abutting private roads or unpaved roads, and *for existing lots* accessing public roads through ingress/egress easements or flag stems. ***The proposed code changes remove the provisions for the creation of lots from Chapter 62-102 and, instead, underline all divisions of land are now addressed in Article VII, Subdivisions.***" **(Emphasis supplied)**

51. Ordinance 10-19 amending §62-102 and adopted by the Commission on October 12, 2010, contained the following recitals:

> "**WHEREAS,** it is the intent of this ordinance to simplify and clarify the provisions of the code authorizing the issuance of residential building permits to ***existing lots of records*** and ***existing parcels*** with restricted physical access while eliminating the division or subdivision of property using flag lots and easements…and; (*Emphasis applied*)
>
> **WHEREAS,** the Board of County Commissioners on January 12, 2010 approved legislative intent…"

52. Ordinance 10-19 substantially amended the Ordinance (§62-102) to specifically provide that §62-102 only applied to "existing parcels" and "existing lots of record." The new first sentence of that section in Ordinance 10-19 read then, and now, as follows: "This section of the Code applies to **existing** parcels and lots of record as defined in this Code. The division or subdivision of a lot or parcel of land is subject to article VII, subdivision regulations." (Emphasis supplied)

53. Mr. Stewart's 4.9-acre parcel did not exist in 2010 and therefore could not constitute an "existing parcel" or "existing lot of record" on October 12, 2010, when Ordinance 10-19 was enacted, thereby making "the division or subdivision of a lot or parcel of land" subject to Article VII, subdivision

regulations.

54. Under Ordinance 10-19 amendments, the application of §62-102, including subsection §62-102(c) pertaining to unpaved road agreements for parcels abutting rights of way that are not county maintained, was limited to "existing parcels" and "existing lots of record," a subsection that otherwise remained exactly the same as the pre-amended §62-102, with the exception of the aforementioned limit upon its application and the staff designated to be responsible for the application review and inspection functions.

55. Under the Ordinance 10-19 rewrite of §62-102, ***any division*** of a lot or parcel of land became subject to regulations in Chapter 62, Article VII, which sets forth subdivision and platting regulations, including the type of access required to obtain a residential building permit.

56. Therefore, when Mr. Stewart filed a 2021 application for a waiver of the 50 ft. road width requirement in section §62-102 (as he had been prompted to do by County staff) §62-102 was no longer applicable to Mr. Stewart's Property because Ordinance 10-19 directed that divisions of property were to be subject to Article VII subdivision regulations.

G. **Factual allegations: Article VII subdivision regulations do not establish permitting standards for privately maintained roads located within a County Right-of-Way**

16

57. Since 2010, according to the introductory sentence of §62-102, the division of a parcel such as the 9.9-acre parcel creating Mr. Stewarts 4.9-acre parcel and a 5.0-remainder parcel, has been subject to Article VII, subdivision regulations, including any requirements a *subdivision* must meet to obtain a building permit. The entirety of Article VII can be viewed online beginning at [ARTICLE VII. - SUBDIVISIONS AND PLATS | Code of Ordinances | Brevard County, FL | Municode Library](#).

58. Indeed, as to building permits for homes, the introductory paragraph to Article VII, §62-2805 expressly states:

> "When a *subdivision* of any land is proposed, the owner of the land shall apply for and secure approval of such subdivision in accordance with article VII subdivision regulations. A subdivision shall be required for the division of a parcel of land whether improved or unimproved, into three or more lots, and a subdivision plat shall be recorded. ***No lots or parcels which would be created shall be sold, nor shall any building permit be approved for the erection of any structure on said lots or parcels until approval is obtained pursuant to this article.***" (***Emphasis supplied***)

59. Mr. Stewart's property was not the result of a division of property into three or more parcels and therefore does not fall within the definition of a subdivision or any other provision under that ordinance, which makes compliance with the ordinance impossible.

60. Notwithstanding the inapplicability of §62-102(c) and applicability of Article VII subdivision regulations to Mr. Stewart's 4.9 created by the division of a 9.9 parent parcel, on January 12, 2022, Mr. Stewart was reminded of the County

Commission imposed conditions in an email from the Director of the County Planning and Development Department which reiterated the County Commission's October 26, 2021 action. The Department Director indicated that, to proceed with the §62-102(c) waiver request, he must provide "a set of signed and sealed plans by a Florida Registered Professional Engineer demonstrating the proposed improvements or the existing improvements or combination thereof met the Minimum Design Standards for Unpaved Roads established in Exhibit 10. A copy of the email and Exhibit 10 appended to that writing is attached as **Composite Exhibit F** to the original Complaint.

61. However, even if §62-102 had applied, *there is no reference* to Exhibit 10 in §62-102.

62. Sometime later, the County provided Mr. Stewart with a sixty-one page book containing "low volume" road standards as an option to the Exhibit 10 unpaved road standards, but those "low volume" standards are also not mentioned anywhere in §62-102 or the County Subdivision Ordinance, and are only applicable to developments providing a minimum 30 percent of affordable or workforce housing units.

63. In 2008, Exhibit 10 *had been* incorporated into §62-2802 of Article VII, *subdivision regulations*, along with twenty-five other exhibits adopted by reference in ordinance 08-09.

64. However, Mr. Stewart's Property does not fall within the Article VII definition of a subdivision subject to Exhibit 10 in §62-2802 because the division of a 9.9-acre parcel into Mr. Stewart's 4.9-acre Property and a 5.0-acre remainder parcel created only *two parcels* and there is no "establishment of a new street" proposed by Mr. Stewart.

65. The Article VII definition of "subdivision" requires either a division of land into three or more contiguous lots or parcels, or the establishment of new street, as set forth in §62-2801 as follows:

> "Subdivision means ***the division of a parcel of land***, whether improved or unimproved, ***into <u>three</u> or more contiguous lots, tracts or parcels of land, designated by reference to the number or symbol of the lot or parcel contained in the plat of such subdivision, for the purpose, whether immediate or future, of transfer of ownership*** <u>or</u>, ***if the* <u>establishment of a new street is involved</u>, *any division of such parcel. The term includes a minor subdivision*, resubdivision and, when appropriate to the context, relates to the process of subdividing or to the land subdivided." (*Emphasis supplied*)

66. The division of the 9.9-acre parcel creating Mr. Stewart's 4.9-acre parcel is further not a subdivision under the definition in §62-2801 because that division of one parcel into two parcels did not involve the submittal or approval of a plat designating the 4.9-acre parcel and 5.0-acre parcel by reference to a number or symbol on the plat for the purpose of transfer of ownership.

67. Because the existing access road abuts two residences for which the access road is their principal and *only* access, Mr. Stewart's proposed single-family residence does not require the creation of a new street, since §62-2801 defines

"street" as follows: "*Street* means a road which affords the principal means of access by vehicles to abutting property."

68. Therefore, Mr. Stewart's 4.9-acre Property is not a subdivision within the definition of a subdivision that would be subject to the Article VII subdivision regulations. Moreover, Exhibit 10 is not applicable to his Property since Exhibit 10 sets "Minimum Design Standards for Unpaved Roads" which only apply where unpaved roads are proposed in a *subdivision* for which a street paving waiver would be required under Article VII, §62-2849 entitled "Waivers and Appeals."

69. In fact, the only provision in Article VII expressly requiring that a "*roadway is designed and constructed according to the minimum design standards for unpaved roads*" appears as subsection (1) 1. and 2. of §62-2806 of Article VII, which section is entitled "Required improvements within a **subdivision.**" In the part relevant to unpaved roads, that subsection reads as follows:

"Each **subdivision** shal*l* contain improvements designed and constructed according to the requirements and specifications of this article and the *applicable* policies, regulations, ordinances and articles of the county and the laws of the state as follows:

(1) Streets paved, designed and constructed according to the standards and requirements of *applicable* ordinances and articles. However, *in minor subdivisions the county may approve <u>unpaved roads</u>* subject to the following criteria:

1. The surrounding area has a future land use designation in the comprehensive plan as residential 1:2.5 or lower density and the access road connects to an existing county maintained unpaved road.

2. *The roadway is designed and constructed according to the minimum design standards for unpaved roads, <u>exhibit 10A</u>, for minor subdivisions*." *(Emphasis supplied)*

70. Exhibit 10A in the Article VII subdivision regulations was adopted in County Ordinance 10-19 and expressly refers to "minor subdivisions."

71. In accordance with subsection (1) of §62-2806 of the Code, only minor subdivisions proposing unpaved roads must comply with "the minimum design standards for minor subdivisions, exhibit 10A,." (*See:*¶38 above)

72. A 'minor subdivision' is defined as follows in §62-2801 of the Code:

"Minor subdivision means the division of a parcel of land into not more than six contiguous residential lots, **with no remainder from the parent parcel**."

73. Mr. Stewart's 4.9-acre parcel is also not a "minor subdivision" because the creation of the 4.9-acre Property from a 9.9-acre parent parcel left a 5.0-acre remainder parcel from the original 9.9-acre parent parcel.

**H. <u>Factual Allegations: The County's "Catch 22" of Ordinances Makes it Impossible for Mr. Stewart to Obtain the Access Required for a Building Permit, thereby creating a Statutory Way of Necessity</u>**

**(1) Impossibility of a Building Permit under Article VII**

74. Mr. Stewart's 4.9-acre Property was not an "existing parcel" or an "existing lot of record" when Ordinance 10-19 was adopted substantially rewriting §62-102

and transferring *any division* of parcels out of §62-102 into Article VII subdivision regulations.

75. Pursuant to the 2010 complete revision of the first sentence in §62-102, the division of the 9.9-acre parcel into two parcels creating Mr. Stewart's 4.9-acres was made "subject to Article VII, subdivision regulations."

76. However, Mr. Stewart's Property is not a subdivision or "minor subdivision", within the definitions in Article VII.

77. Yet, the County Director of the Planning and Development department attached Exhibit 10 in an email sent to Mr. Stewart on January 12, 2022, summarizing the County Commission action on October 26, 2021, and specifying requirements of the unpaved road agreement ordinance found in §62-102(c) of Article II as including compliance with the unpaved road design standards in Exhibit 10, which as alleged in ¶ 66 above, only applies to subdivisions proposing unpaved roads.

78. Therefore, the County is arbitrarily, capriciously and with a shockingly deliberate disregard of its own ordinances, wrongly treating Mr. Stewart's Property as either 1) subject to the inapplicable §62-102(c) of Article II, 2) a subdivision, or 3) a "minor subdivision," even though Mr. Stewart's property does not meet the definition of "subdivision" or "minor subdivision."

79. The Property owned by Mr. Stewart is, therefore, not qualified to obtain a building permit under Article VII, since Section 62-2805 no lots or parcels can receive a building permit for the erection of a structure unless approval is obtained under the Article VII subdivision regulations, which only apply to division of a parcel into "three or more lots" pursuant to Article VII. Section 62-2805 reads as follows:

Sec. 62-2805. - Subdivision plan submission procedure
*General requirements:* When a subdivision of any land is proposed, the owner of the land shall apply for and secure approval of such subdivision in accordance with article VII subdivision regulations. A subdivision shall be required for the division of a parcel of land whether improved or unimproved, into three or more lots, and a subdivision plat shall be recorded. No lots or parcels which would be created, shall be sold, nor shall any building permit be approved for the erection of any structure on said lots or parcels until approval is obtained pursuant to this article.

80. The approval required for a building permit under the exemption provisions in Sec. 62-2805 of Article VII, is also impossible to obtain for Mr. Stewart's Property because Article VII, §62-2805(e) only addresses the standards that must be met for approval of exempt divisions of property into two parcels abutting *a county maintained right of way*, but is silent about how approval may be obtained for a residential building permit on a 4.9-acre Property created by the division into two parcels abutting an existing, *privately maintained unpaved access road lying within a county right of way*.

**(2) Impossibility of obtaining a building permit due to county's**

**denial of Mr. Stewart's ability to erect a single-family home as a**

**lot of record as authorized by §62-1188 of the County Code.**

81. Because of the County's attempt to impose *de facto* amendments to the inapplicable §62-102 unpaved road agreement Ordinance, Mr. Stewart, through his attorney, brought the first sentence of §62-1188 to the attention of County staff and County Commission as a provision that would allow the application for and issuance of a building permit without having to construct a "road to nowhere".

82. The express language of the first sentence in §62-1188 of the County Code specifically allows the construction of dwellings on lots of record, "notwithstanding limitations imposed by other provisions of the chapter." That sentence reads as follows:

> "**Sec. 62-1188. - Nonconforming lots of record.**
> In any zoning classification in which dwellings, structures or buildings are permitted, *notwithstanding limitations imposed by other provisions of the chapter*, such dwellings, structures, buildings and customary accessory buildings as are permitted may be erected on any lot of record, provided that such lot of record met the requirements of the county comprehensive plan and zoning regulations at the time such lot was recorded or platted."

The entirety of §62-1188 is set forth as **Exhibit G** to the original Complaint.

83. According to the first sentence of §62-1188, Mr. Stewart should be entitled to apply for a building permit for a dwelling since Mr. Stewart's Property meets

the definition of a "lot of record" specified in that sentence in that the Property: (1) is a parcel described in a recorded deed conveying the Property to Mr. Stewart; (2) is a parcel designated as Residential 1 on the Comprehensive plan with an AU classification at the time the lot was recorded; and (3) meets the definition of a "lot" under the County zoning ordinance, which defines a "lot" as follows:

> "*Lot* means a parcel of land shown on a recorded plat, ***or any piece of land described by a deed recorded in the official records book of the county***."

84. However, the County has determined in writing that, in order to qualify for the right to erect a dwelling on the Property, the "lot of record" mentioned in the first sentence of §62-1188 only applies to a "nonconforming lot of record."

85. In taking that position, the County Commission and County officials have arbitrarily, capriciously and with shockingly deliberate indifference to existing County ordinances, *de facto* amended the plain language in the first sentence of §62-1188 which clearly allows the erection of a dwelling on a "lot of record" where (1) the Property meets the requirements set forth in that first sentence and; (2) the Property far exceeds the lot depth, width and area requirement specified in subsection section (1) of §62-1188.

86. The County Commission and County staff have also arbitrarily, capriciously and with shockingly deliberate indifference to existing County ordinances *de facto* deleted or ignored subsection (5) of §62-1188 which would qualify Mr.

Stewart's Property as a "nonconforming lot of record" since, as written, that subsection expressly includes as a "nonconforming lot of record," any lot that meets the criteria in both the first sentence of subsection (5), to wit, consistency with the comprehensive plan and zoning regulations at the time the lot was established; and the criteria set forth in subsection (5)a., to wit, a lot "recorded in the official record books or plat books of the county." In its entirety subsection (5) of §62-1188 reads as follows:

> "(5) *Nonconforming lots also <u>include</u> those lots which were consistent with the comprehensive plan and zoning regulations at the time they were established and*:
> a. *Are recorded in the official record books or plat books of the county*;
> b. Existed pursuant to a fully executed but unrecorded deed; or
> c. *Existed pursuant to a valid contract for deed or contract for purchase*.
> A lot, parcel or tract of land which is zoned AU, agricultural use, and is less than 2.5 acres in size may also be determined to be nonconforming if the lot, parcel or tract of land was recorded in a survey book prior to March 6, 1975. A lot, parcel or tract of land which is zoned GU, routine use, and is less than five acres in size may also be determined to be nonconforming if the lot, parcel or tract of land was recorded in a survey book prior to May 20, 1975." (*Emphasis supplied.*)

87. Moreover, at the time Mr. Stewart appeared before the County Commission seeking the 50 ft. right of way waiver at the prompting of County staff, the Property met the criteria of subsection §62-1188 (5)c as a lot of record existing by virtue of a valid contract for purchase.

88. Notwithstanding the arbitrary, capricious and shockingly deliberate indifference of the County Commission and County staff in their respective

attempts to *de facto* delete or amend express provisions §62-1188 of the County Code, Mr. Stewart's Property has, at all times, met the relevant conditions qualifying his property for erection of a dwelling as specified in §62-1188 as it currently exists.

89. The County has, in fact, arbitrarily and capriciously *de facto* amended §62-1188 by conflating the inapplicable definition of a "nonconforming *use*" set forth in §62-1181 of Article VII, into the express definition of "nonconforming lot of record" set forth in the stand alone provisions of §62-1188, which is a change to §62-1188 that can only be enacted as a legislative ordinance amendment complying with the procedures established under Florida law.

90. Policy 1.1 B of Chapter 15 of Brevard County's Comprehensive Plan is to have Brevard County consider "[t]he right of a property owner to use, maintain, develop and improve his or her property for personal use or the use of any other person."

**(3) Impossibility of obtaining a building permit due to the County's refusal to allow Mr. Stewart access over the statutory way of necessity it has created to the Property for the purpose of constructing a residential dwelling**

91. Mr. Stewart, through counsel, has notified the County Commission of Mr. Stewart's claim to a statutory way of necessity over the access road, a right of

access now vested by operation of §704.01(2), Florida Statutes which applies to both private parties and governmental entities. Specifically, a statutory way of necessity exists under that statute because the various County land development regulations *de facto* amended in the manner described above, have landlocked the Property thereby creating a statutory way of necessity as a "permanent access way" that would allow Mr. Stewart to apply for the erection of a dwelling on the Property due to the following facts:

a. Mr. Stewart has clearly informed the County Commission he wishes to use his 4.9-acre Property to erect a dwelling;

b. By fiat of the County's legislative scheme as established through the County's ordinances, and through the County's arbitrary, capricious, and shockingly deliberate indifference to the existing provisions in its unpaved road, subdivision, and "lot of record" ordinances, as well as the *de facto* quasi-legislative amendments thereto, the County has arbitrarily, capriciously and unlawfully through *de facto* legislative and quasi-legislative acts, caused a regulatory shut off of all access to the Property required for the erection of a single family dwelling;

c. Considering Mr. Stewart's desired residential dwelling use, the existing access road within the County's dedicated and accepted 30

ft. wide right-of-way is the nearest practical route to reach Dixie Highway, the nearest public road;

d.  The existing access road is practicable since the access will not require the use of a bridge, ferry, turnpike road, embankment or substantial fill because the access has existed, been privately maintained and in use since before 1967.

e.  Mr. Stewart has offered to pay the County 50% of the value per acre as compensation for the right, in the form of an easement or other document granting him the right to utilize the access road within the County right of way as access to the Property for construction and use of one single family residential dwelling.

92.  Under the circumstances outlined above, the access road constitutes a statutory way of necessity as a matter of right under Fla. Stat. §704.01(2).

93.  The County has refused to allow Mr. Stewart to access the Property over the statutory way of necessity the County has created within the lands comprising its right of way, thereby preventing Mr. Stewart from complying with the access requirement in the County's building permit application process, which is set forth in subsection (4) below.

**(4)  The County legislative scheme makes it impossible to comply with the access requirement in the County building permit application process.**

94. Sections 22-46 through 22-50 in Article II of the County's adopted Building Code (Chapter 22 of the Code) provide an exhaustive list of requirements that must be successfully met to obtain approval of a building permit application for erection of a residential dwelling on Mr. Stewart's property.

95. Those requirements include a site plan showing "permanent access ways" and an onsite drainage retention plan.

96. Article II, section 22-50 of the County Building Code states that "No building permit shall be issued until the permit applicant demonstrates that the proposed construction will not violate any land development regulations or any provisions of this article."

97. Mr. Stewart cannot provide a site plan showing "permanent access ways" as required by subsection *104.2.6* 1. and section 22-50 of the County Code for the following reasons:

    a. the County's arbitrary, capricious and shockingly deliberately indifference to existing county ordinances evidenced by *de facto* amendments to the County land development regulations discussed in this Complaint;

b. the lack of any applicable access standard in Article VII subdivision and platting provisions for a property abutting a county right of way in which a privately maintained access road is located (such as Mr. Stewart's 4.9-acre Property); and

c. the County's refusal to allow Mr. Stewart access over the County caused statutory way of necessity to the Property, thereby preventing Mr. Stewart from submitting a site plan showing a permanent access way, in accordance with subsection *104.2.6* 1. and section 22-50 of the County building code;

98. Therefore, any application for a building permit by Mr. Stewart would be futile and denied by the County.

I. <u>**Factual allegations: County's precedent for not applying §62-102 to other constructed dwellings connected to the access road.**</u>

99. Instead of recognizing the access road as a statutory way of necessity that would allow Mr. Stewart to apply for a building permit, the County has insisted that Mr. Stewart abide by §62-102(c), the inapplicable unpaved road agreement ordinance.

100. The County Commission required Mr. Stewart to submit an engineer's road construction plans conforming to the County's unpaved road design standards and an engineer's drainage plan for the road before the Commission would

31

even hear, much less decide, the original inapplicable 50ft. road width waiver request promoted by County staff, which request was dragged out for two years by the County's arbitrary and capricious requirements and the County Commission's shockingly deliberate indifference toward applying its own applicable ordinances to Mr. Stewart before he was advised by Counsel that he should not have been prompted by the County to file a waiver request in the first place.

101. Through his attorney at a public meeting, Mr. Stewart informed the County Commission of the inapplicability of §62-102(c), the inapplicability of the subdivision ordinance, and the applicability of §62-1188. Mr. Stewart's counsel also informed the Commission of Mr. Stewart's refusal to abide by the arbitrary and capricious exactions the Commission had imposed under the inapplicable §62-102, which included the ordinance requirement that Mr. Stewart obtained from his neighbors, at his cost, a total length of 710 ft. and 20 ft. width of right-of-way if no waiver was granted; that he build a road, at his cost and donate the additional right-of-way to the County, which construction and donation would benefit property owners beside Mr. Stewart, including those from whom he would have to obtain the additional right-of-way; and that road had to be built to the inapplicable Exhibit 10 unpaved road

design standards found in Article VII, which only regulates subdivisions, not division of one parcel into two parcels.

102. The Commission had also been informed that Mr. Stewart had been unsuccessful in this attempt to acquire the additional right-of-way.

103. Apparently not understanding that the easternmost property line of the Property was located approximately 325ft. from the terminus of the County right-of-way, a Commissioner at that same public meeting erroneously claimed that, under yet another County ordinance, Mr. Stewart would have to construct a "turnaround" for emergency vehicles at the easternmost edge of the Property, even though the ordinance cited by the Commission only applies to property where the right of way terminus is located.

104. Notably, in 1996 and again in 2005, before the 2010 amendment to §62-102 placing divisions of parcels under the Article VII subdivision regulations, the provisions of §62-102(c) were virtually identical to the §62-102(c) unpaved road agreement provisions in 2021 and under those prior ordinances, building permits for residences were issued to two owners abutting the same access road that Mr. Stewart desires to use for access to proposed dwellings. One of those properties abuts Mr. Stewart's property to the west and the other is caddy-corner across the access road from the Property at its southwest corner.

105. As the only two homes abutting the access roads, both homes have a driveway connected to the access road and both owners of those homes use the access road as the only access to their respective driveways.

106. In response to a public records request for permitting documents related to the two homes that now have driveways connected to the access road, the County produced records for the home built in 2005 showing a concrete driveway oriented toward the access road, which is where the driveway was connected.

107. Though the County could not produce records for the home built in 1996, among the permitting documents provided by the County in response to the public records request for the home built in 2005 there was:

   a. **no record** indicating that the issuance of a building permit required approval of an unpaved road agreement;

   b. **no record** indicating that the issuance of a building permit required a waiver to the unpaved road agreement ordinance;

   c. **no record** indicating that the issuance of a building permit required an engineer-prepared unpaved road design plan complying with County unpaved road design standards or a drainage study, other than for onsite retention of drainage which was required under §22.50

of the building permit application provisions in the County Building Code;

d. **<u>no record</u>** indicating that the issuance of a building permit required the owners to meet the 50 ft. road right of way width requirement or the LDR 40 density requirement specified in the virtually identical pre-2010 versions of §62-102 in effect when those permits were issued;

e. **<u>no record</u>** indicating that the issuance of a building permit required any road construction or road improvements at the owners' cost, other than the specifications for connection at the property line where the driveway tied into the County right of way containing the access road;

f. **<u>no record</u>** indicating that the issuance of a building permit required any acquisition of right-of-way at the lot owners cost or a donation of right of way to the County in order reach the 50 ft. right-of-way width requirement;

g. **<u>no record</u>** of a requirement to build a turnaround for emergency vehicles;

h. **<u>no record</u>** indicating that the owners' driveways could not serve as a turnaround for emergency vehicles.

## J.  Factual Allegations: The Impasse

### [1] The Stewart / County Stalemate

108. In an email exchange between Mr. Stewart and Terry Talbert, the Chief Building Official for Brevard County on July 23 and July 24, 2024, Mr. Stewart was informed that he could not apply for a building permit without an address for the property. A copy of that email is attached hereto as **Exhibit H**.

109. Because the address assignment staff in Brevard County determined that Mr. Stewart's property did not have access to a County road, the County would not issue an address assignment for the Property which, had that address assignment been issued, may have allowed him to file a building permit. A copy of the email documenting this allegation is attached hereto as **Exhibit I**.

110. As a result of the denial of an address assignment, Mr. Stewart is also unable to obtain utility service from the utility company providing that service through facilities that abut Mr. Stewart's property. A copy of the email denying Mr. Stewart's request for utility services is attached hereto has **Exhibit J**.

111. Mr. Stewart subsequently learned from his Counsel that a 2010 amendment to the unpaved road ordinance, section §62-102(c), on its face, made divisions of property, as occurred with Mr. Stewarts property, subject to County subdivision ordinance regulations.

112. Mr. Stewart was further informed by his Counsel that the subdivision ordinance does not address standards for a division of property into two parcels since that ordinance only applies to divisions into three or more parcels or two parcels abutting a county-maintained county right of way, as evidenced in the allegations set forth in ¶¶108 to 111 above.

113. Mr. Stewart was also advised by Counsel that §62-1188 and Chapter 22 of the County Code were possible ordinances that could allow application for a building permit.

114. Mr. Stewart's Counsel subsequently appeared in a public meeting before the County Commission and explained his client's position that neither §62-102 nor the subdivision applied to Mr. Stewart's situation, and that §62-1188 and Chapter 22 allowed an application for a building permit.

115. The response of the County Commission was to insist Mr. Stewart meet the Commission's demand that he provide an engineering study "with additional easements of the right-of-way  including necessary improvements," complying with Exhibit 10 unpaved road and drainage standards set forth in the County subdivision ordinance, as well compliance with ordinance §62-102 provisions requiring Mr. Stewart to acquire those "additional easements of right-of-way" from private owners, at his cost—an unconstitutional exaction especially since

neither of the other two home owners using the existing unpaved road had such conditions imposed upon them when they obtained building permits.

116. Both the County Manager and the County Commission have subsequently refused to take any further action on the §62-102 (c) waiver request, despite Mr. Stewart's request that they do so, even though County staff had recommended filing the waiver request stating to Mr. Stewart that his property was a perfect candidate for a waiver under §62-102 (c).

117. However, the County Commission, through its Chair, took the position that both §62-102(c) unpaved road ordinance and the County subdivision ordinance are applicable to Mr. Stewart's property and the Commission would not act upon Mr. Stewart's application or his administrative takings claim unless the Commission's arbitrary conditions were complied with by Mr. Stewart.

118. Mr. Stewart continues to refuse to comply with the arbitrary conditions imposed by the County Commission under the alleged auspices of two inapplicable ordinances and the failure to allow him to apply for a building permit under §62-1188 of the County Code and Chapter 22, the County Building Code, both of which do apply.

119. Notably, §62-2805 of the County subdivision ordinance relied on by the Commission through its chair prohibits approval of a "building permit for the

erection of any structure on said lots or parcels until approval is obtained pursuant to this article."

120. It was therefore futile for Mr. Stewart to apply for a building permit because the subdivision ordinance, by its definition of a subdivision as land divided into three or more parcels or lots, does not apply to a division of a parcel into two parcels, as is the case with Mr. Stewart's property.

121. The parties have clearly reached an impasse that is further evidenced by these additional facts demonstrating impossibility, bias, animus and unreasonableness on the part of the County:

a.  The District 1 Commissioner/Chair personally registered a September 2021 Code violation complaint with the County Code Enforcement Department based upon the deposit of asphalt millings on the *privately* maintained unpaved road abutting what is now Mr. Stewart's property.

b.  The Chair has publicly called out her objections to the property sales methodology used by the individual who sold the 4.9 acres to Mr. Stewart.

c.  Commissioner Tobia publicly ridiculed Mr. Stewart's waiver application during the above-referenced public meeting based upon:

   1)  Mr. Stewart's refusal to conform to conditions imposed by the County Commission;

    2) Commissioner Tobia's ill-informed and entirely erroneous supposition that Mr. Stewart had been required by ordinance to build a turnaround at the termination of the existing unpaved road under a provision that only applies to property for which the property line abuts the end of the right-of-way, not a property line that is 325 ft. west of the end of the right-of-way as is Mr. Stewart's property.

d. County Commissioner Tobia also asked if the additional twenty feet of right-of-way had been obtained from private owners by Mr. Stewart in order to meet the 50ft. right-of-way width requirement, which Mr. Stewart had attempted to acquire without success. (See ¶¶39c. and 103 above).

e. Mr. Stewart's Counsel's responded to Commissioner Tobia's ridicule by informing him and the County Commission that what is ridiculous is Commissioners that do not follow their own ordinances; especially ordinances that do not require or authorize any of the conditions imposed; "and the fact that Commissioner Tobia thinks they do, is where the error is."

f. At that same public hearing, Counsel for Mr. Stewart likewise informed the Commission that the County's refusal to allow Mr. Stewart to apply for a building permit had created a statutory way of necessity under a state law that expressly allows the construction of a residential dwelling on Mr. Stewart's property since his 4.9 acre parcel has been regulatorily landlocked

as a result of the County's refusal to apply the provisions of applicable, duly adopted ordinances in the Code that would allow an application for a building permit for a residence on the existing unpaved road.

122. The County thereby refused to recognize that way of necessity and the statute expressly authorizing construction of a residential dwelling accessed by the nearest practicable means, which is the decades old unpaved road abutting Mr. Stewart's property and used by two other residences using that existing right-of-way for access.

### [2] Refusal to Hear Administrative Takings Claim

123. On August 15, 2022, seeking to exhaust administrative remedies, Mr. Stewart filed an administrative "takings" claim with the County under §62-507 of the County Code. The County failed to hold the hearing required by that section and, in fact, never responded to the takings claim.

124. On March 21, 2023 counsel for Mr. Stewart finally had to appear before the County Commission to ask for a hearing on the takings claim. During that appearance:

a. The Board and its Chair, who is the District Commissioner where the Stewart property is located, was clear that it would take no action on the takings claim or the two-year pending waiver request filed by Mr. Stewart until Mr. Stewart complied with the above-referenced conditions which

included a requirement that he obtain easements from private property owners which Mr. Stewart attempted, but was unsuccessful in obtaining. (See ¶¶39c. and 103 above).

b. Commissioner Tobia specifically asked if the additional (20 ft.) right-of-way had been obtained to meet the 50ft. right-of-way width requirement.

c. Mr. Stewart's Counsel informed the County Commission that his client had not been successful in obtaining those rights of way, which are owned by private parties. Mr. Stewart does not have the powers of eminent domain possessed by Brevard County.

d. Therefore, it was impossible for Mr. Stewart to comply with the easement condition imposed by the County Commission, even if the condition was valid or if §62-102(c) applied, neither of which is the case.

e. Mr. Stewart's Counsel responded that the claim before the County was based on the takings claim because the State law vests a statutory way-of-necessity in any property owner whose land is landlocked; and that what Mr. Stewart was claiming is that the County has prevented him from getting a building permit for his Property because, on their face, all the ordinance criteria and conditions the Commissioners were trying to impose upon Mr. Stewart under the unpaved road and subdivision ordinances are inapplicable to his particular situation.

42

125. Mr. Stewart's Counsel also stated to the County Commission in the aforementioned public meeting that his client was not going to pay $20,000-$100,000 for an engineering report that is not required by Ordinance and if the Board is going to say no to the waiver request, just say no, and they will go about it some other way.

126. Obtaining such an engineering study would constitute a futile and expensive act since Mr. Stewart has found it impossible to comply with the County Commission condition requiring Mr. Stewart to acquire right-of-way from private owners.

127. At the aforementioned public meeting, the County Attorney stated that if Mr. Stewart's answer is that he is never going to provide the things that the Board requested, then he thinks the next thing that needs to be brought forward for final action is the waiver application.

128. The County Commission has taken no action on the request for a hearing on the takings claim; has taken no action on setting the waiver claim for a final hearing; and, through their counsel, has taken the mistaken position the takings claim is not ripe until the Commission acted on the request for a waiver under the inapplicable §62-102(c) unpaved road agreement ordinance.

129. Therefore, the fact that it is impossible for Mr. Stewart to comply with the County Commission's condition requiring right of way acquisition before the

Commission will proceed with his waiver application or takings claims rendered the Commission's tabling of the waiver application and refusal to act on either the waiver request or administrative takings claim until such an impossible condition is met, *de facto* final action on both Mr. Stewart's waiver application and his administrative takings claims.

130. However, Stewart appeared at a Brevard County Commission meeting where his waiver request was denied by the County as shown on the transcript attached hereto as **Exhibit K**.

131. Complying with the standard offered by the County is impossible and futile as the standards are not applicable to Stewart's Property.

## GENERAL STATEMENT OF §1983 CLAIMS

132. This is an action under 42 U.S.C. §1983 arising out of the Defendant County's deprivation of Plaintiff's property rights in violation of substantive and procedural due process of law; taking of Plaintiff's Property without just compensation in violation of the Fifth Amendment to the U.S. Constitution, which is incorporated into 42 U.S.C. §1983; and denial of equal protection of the law.

## COUNT 1:  EQUAL PROTECTION CLAIM

133. Plaintiff hereby incorporates the allegations of ¶1 through ¶132 as though the same were set forth in full herein.

134. Based on documents presented by the County in public records requests, the Defendant County has denied Plaintiff the equal protection of the law by having no rational basis for:

    a.  Allowing two other owners of parcels with more than 4 acres of property abutting the access road, but not Mr. Stewart, to proceed through the building permit process without an unpaved road agreement;

    a.  Allowing two other owners of parcels with more than 4 acres of property abutting the access road, but not Mr. Stewart, to file single-family home building permit applications that only required engineering relating to onsite drainage;

    b.  Allowing two other owners of parcels with more than 4 acres of property abutting the access road, but not Mr. Stewart, to file single family home building permit applications without the County Commission ordering that they provide the County with an engineering analysis evaluating whether the access road could be built to the same three county design standards set forth in the three unpaved road ordinances in effect at the time those applications were filed, all of which are identical in all relevant respects;

    c.  Granting two other owners of parcels with more than 4 acres of property abutting the access road, but not Mr. Stewart, single-family residential building permits;

45

d. Allowing those two other owners, but not Mr. Stewart, to construct homes with driveways connected to the access road as their sole means of reaching their homes;

e. Not requiring those two owners, but requiring Mr. Stewart, to dedicate additional right-of-way or easements to expand the right-of-way to the required 50 ft. width;

f. Not requiring the other two owners, but requiring Mr. Stewart, to construct the access road to the same 50 ft. right of way standard, LBR 40 standard, and 1,320 distance requirements in effect under the unpaved ordinances in effect current ordinance;

g. Not requiring the two other owners, but requiring Mr. Stewart, to obtain a 50 ft. width waiver before filing for a residential building permit;

h. Not requiring those other two owners, but requiring Mr. Stewart, to have engineering plans prepared, at an estimated cost of $10,000 to $25,000, setting forth engineering analysis of road design and offsite drainage impacts based upon unpaved road standards required in county ordinances that are inapplicable to privately maintained unpaved roads within County right-of-way, as was done in this case;

i.   Not requiring the two other owners, but requiring Mr. Stewart, to construct improvements to the access road estimated at a cost of well over $100,000 in current dollars;

j.   Not requiring those two owners, but requiring Mr. Stewart, to acquire at their cost, or donate from their property additional right-of-way to meet the 50 ft. right-of-way width standard that was in effect when both permits were issued;

k.   Imposing *de facto* amendments to otherwise inapplicable County ordinances and then attempting to force Mr. Stewart to comply with those *de facto* provisions in order to be eligible for use of the access road that would allow him to meet the requirement for a residential building permit, when those *de facto* amendments were not imposed on the two other property owners who are able to use the access road to obtain access to their driveways, both of which are connected to the access road;

l.   Attempting to make Mr. Stewart comply with an unpaved road agreement ordinance that neither of the other two property owners on the access road were required to comply with, even though virtually identical unpaved road provisions were in effect at the time residential building permits were issued to the other two owners;

m. Without any applicable ordinance provision or authority, requiring Mr. Stewart, at his cost, to prepare engineering plans showing how an unpaved road can be constructed within a 30 ft. County right-of-way in compliance with inapplicable County unpaved road construction standards set forth in Exhibit 10 to the subdivision ordinance when there was no such requirement imposed on the other two owners who received building permits for property abutting the access road within the county right-of-way;

n. Requiring Mr. Stewart to acquire property from neighboring property owners, donate that property to the County, and construct the access road to inapplicable county unpaved road standards at his cost when the two other property owners already connected to the access road were not required to make donations of or construct the access road to county standards in order to obtain a residential building permit and the right to use the access road;

o. Without any applicable ordinance provision, requiring Mr. Stewart to obtain an engineer's analysis of offsite drainage conditions at his cost when no such requirement was applied to the two other owners receiving county residential building permits.

135. The Commissioners Mr. Stewart vigorously complained about his unequal treatment in emails to the County Commission and actions by the Commission following those complaints included a rebuke of Mr. Stewart at a public meeting where Commissioners announced their refusal to respond to his emails. The District 1 Commissioner also indicated her consternation "because someone out there put millings on the County's right-of-way after she had made it clear to not mess with it right now" and her feeling that the millings deposit was "suspect" having supposedly taken place after the October 26, 2021 waiver hearing.

## COUNT 2: SUBSTANTIVE DUE PROCESS CLAIM

136. Plaintiff hereby incorporates the allegations of ¶1 through ¶132, as though the same were set forth in full herein.

137. After being placed on notice by the Plaintiff through his counsel that the County Commission's legislative scheme under the unpaved road Ordinance and subdivision ordinances was facially inapplicable to Mr. Stewart's circumstances, and after being placed on notice that §62-1188, the "nonconforming lot of record" ordinance, provided a way to allow Mr. Stewart to apply for a residential building permit, the County Commission arbitrarily, capriciously, irrationally, intentionally, pretextually, and with shockingly

deliberate indifference to the provisions of existing ordinances, as well as unlawful *de facto* quasi-legislative amendments of those ordinances:

a. in its legislative capacity imposed upon Mr. Stewart *de facto* ordinance amendments representing uncodified and unadopted quasi-legislative Commission policy decisions;

b. demanded that Mr. Stewart comply with the County's inapplicable and *de facto* amended unpaved road and subdivision ordinance provisions;

c. *de facto* repealed, as to Mr. Stewart, the County's "nonconforming lot of record" ordinance provisions that allow Mr. Stewart to apply for a residential building permit;

d. doubled down on the County Commission's imposition of *de facto* new unpaved road ordinance provisions requiring the Plaintiff to obtain, at his cost, engineering design drawings consistent with inapplicable unpaved road design standards, as well as an engineering analysis of offsite drainage not required under any ordinance, as written;

e. insisted that the division of a 9.9-acre larger parcel into two parcels created a subdivision, thereby *de facto* amending the County subdivision ordinance by essentially expanding the definition of "subdivision" to include lots of record and nonconforming lots of record located within a County right of way;

f.  requiring compliance with Exhibit 10 a list of twenty-two standards for the design of unpaved roads, thereby unlawfully engage in legislative action *de facto* amending its subdivision ordinance to apply to Mr. Stewart, when in fact, those standards only apply to unpaved roads proposed in major subdivisions;

g.  through legislative action unlawfully exercised by the County Staff, offered Mr. Stewart alternative road construction standards found in a sixty-one page manual relating to "low traffic volume," which publication is only referenced in §62-6310 of the County Code pertaining to "Alternative and flexible design requirements and criteria for developments providing a minimum 30 percent of affordable or workforce housing units," a publication that is not referenced in the County's subdivision ordinance or unpaved road ordinance, and which is completely inapplicable to the existing privately maintained access road providing access to a proposed single dwelling on the Plaintiff's property;

h.  insisted that the Plaintiff construct and donate to the County a "road to nowhere" to those inapplicable unpaved road standards which require Mr. Stewart to assume all of the cost for construction benefitting the few other property owners abutting the road, including two from whom Mr. Stewart would have to purchase the necessary easements, all of which constitutes a

disproportionate and unconstitutional exaction required from Mr. Stewart, especially since:

   i. Mr. Stewart stated his attempt and inability to obtain such easements;

   ii. the County has the ability to exercise the power of eminent domain to acquire such easements and the power to impose special assessments to spread the cost of constructing the road among all benefitted property owners abutting the access road, if the County Commission deems it necessary; and

   iii. the County Commission had knowledge, from its staff, that asphalt millings on the access road would be adequate for the use of emergency vehicles;

i. insisted on compliance with a "turnaround construction" ordinance provision that did not apply on its face;

j. deprived Mr. Stewart of his vested statutory way of necessity to the Property and the right to build a single family residence due to: 1) the landlocking of the Property by the County Commission's scheme of existing regulatory ordinances; 2), the Commission's *de facto* amendments to regulatory ordinances; and 3) the Commission's permit Mr. Stewart's access to the Property over the resulting statutory way of necessity under §704.01(2), Florida Statutes, which statute vests in Mr. Stewart the statutory

right to access to the Property and right to a dwelling on the Property, as a matter of statutory law.

## COUNT 3: PROCEDURAL DUE PROCESS CLAIM

138. Plaintiff hereby incorporates the allegations of ¶ 1 through ¶132 as though the same were set forth in full herein.

139. The County has violated the Plaintiff's due process rights by *de facto* amending without the necessary notice and public hearings required by laws of the state of Florida, 1) an inapplicable unpaved road ordinance; 2) the subdivision ordinance definition of a "subdivision" to make it applicable to a division of a parcel abutting a privately maintained access road located within a County right-of-way, where no such provision exists; and 3) the definition of a "lot of record" and "nonconforming lot of record" by conflating those definitions with the definition of a "nonconforming use" that is inapplicable where no actual physical use of the Property at issue.

140. Such actions by the County have delayed and severely frustrated any ability of the Plaintiff to apply for, much less receive, a residential building permit for nearly two years and counting in which mortgage interest rates have gone from around 2% to nearly 7%, and construction costs have skyrocketed.

## COUNT 4:  FIFTH AMENDMENT TEMPORARY TAKINGS CLAIM AND PERMANENT MANDATORY INJUNCTION

141. Plaintiff hereby incorporates the allegations of ¶1 through ¶132 as though the same were set forth in full herein.

142. The Defendant County has engaged in a regulatory taking of the Plaintiff's actual and statutory rights to access and use his 4.9-acre property for the construction of a single-family dwelling, as expressly authorized under §704.01(2), Fla. Stat., which taking is potentially temporary and has occurred without due process of law and existing County ordinances. In particular the County has:

a. undermined Mr. Stewart's reasonable investment backed expectations of access to and development of his Property, which access, and development has, to this point in time, been denied by the County without due process;

b. denied access to the Property for construction of a dwelling, and prevented Mr. Stewart from applying for or obtaining a residential building permit on the Property which has the required land use designation and zoning classification allowing construction of a residential dwelling, for which land he paid $80,000;

c. prevented the Plaintiff's reasonable investment backed expectations of residential use by engaging in a "Catch 22" landlocking of the Property by way of the County's shockingly deliberate indifference to its own existing

ordinances, and by attempting to apply inapplicable ordinances; adopting *de facto* amendments to those ordinances; failing to apply existing ordinances as written; and making it impossible to apply for, much less receive a building permit for a residential dwelling on the Property; all without procedural or substantive due process of law;

d. refused to permit Mr. Stewart's use of a vested statutory way of necessity arising under §704.01(2), Florida Statutes which is a statutory property right accompanied by the express statutory property right to erect a dwelling on the Property, again without due process of law;

e. refused to allow the Plaintiff's use of the existing access road as a permanent access to his Property for residential purposes, even though the access road has been in existence since before 1967and that road is currently being used by two other owners of parcels abutting the access road, both of whom obtained building permits to erect residences with driveways connected to the access road without having to make any road or drainage improvements to the access road, again without due process of law;

f. required disproportionate exactions by requiring the Plaintiff to purchase several hundred feet of 20 ft. wide easements from abutting property owners and donate them to the County, when such easements are unavailable;

g. *de facto* amended existing ordinances without procedural due process to exact from the Plaintiff, at Mr. Stewart's cost, engineering design and road construction plans conforming to unpaved road standards and subdivision standards, as well as an offsite drainage impact analysis, when there is no applicable ordinance imposing such requirements;

h. placed Mr. Stewart in a position of having to purchase and park a fifth wheel camper travel trailer on the Property for shelter on his 4.9-acre property which, due to the property's lack of access as a result of the Commission's actions, is not eligible for an address assignment which also prevents him from obtaining utility services available to other residential homes abutting the access road.

143. The County has stubbornly prevented Mr. Stewart from constructing his desired dwelling on the Property by engaging in a regulatory taking of the vested statutory way of necessity the County has created by that taking.

144. The County has specifically refused to follow its own ordinances (specifically §62-1188 and Chapter 22 of its Code) unless Mr. Stewart complies with unsupported *de facto* conditions and exactions imposed by the County under the ostensible authority of inapplicable unpaved road and subdivision ordinances, for which there is no remedy at law absent a permanent and mandatory injunction to force the County recognize Mr. Stewart's vested

statutory way of necessity and thereafter comply with the County's applicable ordinances.

145. Mr. Stewart has suffered irreparable injury, *per se*, by virtue of the continuing delay and stubborn refusal of the County to allow Mr. Stewart to access the Property for construction of a residential dwelling over the statutory way of necessity which the County has caused to exist.

146. The injunction remedy in equity is warranted upon consideration of the balance of continuing hardships being suffered by Mr. Stewart and the lack of any hardship at all to the County.

147. The permanent injunction being sought will not hurt the public interest and any claim to the contrary by the County would be pretextual, unwarranted and, at this point, retaliatory.

## DAMAGES AND PRAYER FOR RELIEF

WHEREFORE Plaintiff alleges the following damages and prayer for relief:

A. Trial by jury on all claims so triable.

B. The Court's declaration that the county has deprived Mr. Stewart of his vested state-created statutory property right to access to the Property by denying equal protection of the law; violation of substantive due process; and violation of procedural due process; and resulting temporary taking.

C. Damages for all counts, including those specified below, arising out of the deprivation of his vested statutory way of necessity and his Property caused the County's arbitrary, capricious, egregious and shockingly deliberate indifference to their own existing ordinances, state procedural law for amending ordinances, and deprivation of Mr. Stewart's vested statutory Property rights to access his Property and exercise his statutory vested rights to construct and reside in a dwelling on the Property under state law, such deprivations being caused by the County's regulatory County landlocking of his property; as well as the County's discriminatory actions against him, by allowing two other owners to access their property over the access road, but not Mr. Stewart.

D. Mr. Stewart seeks compensatory and consequential damages arising out of those deprivations, as well as expenses he has and will continue to incur as follows:

1. Mr. Stewart sold his house to use the proceeds to pay for the Property expecting to be able to build a dwelling on the property using the Property as security for the construction loan. Due to the deprivation of his property rights, and resulting delay caused by the County's arbitrary, capricious, egregious and shockingly deliberate indifference to its own ordinances; disregard of state procedural law for amending ordinances;

and the County's discriminatory treatment of Mr. Stewart, he seeks the increase in value lost on the sale of his home, a sale that would have been postponed if the shockingly arbitrary and capricious delay caused by the County had been known to him;

2.   Because of the deprivation of his property rights causing substantial delay due to the County's actions, Mr. Stewart was forced to rent a home for a total of 14 months, before being forced out due to the owner selling the home. Brevard County's deprivation of his property rights is the direct cause underlying Mr. Stewart being forced to remain in that rental home for an additional 7 months. Mr. Stewart seeks reimbursement as compensatory damages for the extra 7 months.

3.   Because of the deprivation of his property rights caused by the County's actions, as mentioned above, Mr. Stewart has been forced to purchase and live in a fifth wheel camper travel trailer on the Property, a cost for which he seeks reimbursement.

4.   Because of the deprivation of his property rights by the County, as alleged above, Mr. Stewart has not been able to obtain electric service or emergency medical services on the Property due to the County's refusal to issue an address. He has therefore been forced to purchase a generator

and to provide onsite electricity, for which he seeks compensatory damages.

5. Because of the deprivation of his property rights caused by the County's actions, as mentioned above, Mr. Stewart will incur and seeks consequential damages for the increase in costs for constructing a dwelling on the Property over the period of delay caused by the County's actions which has now exceeded four years and counting, during which construction costs and mortgage interest costs on residential properties have surged dramatically, for which Mr. Stewart demands consequential damages based on the differential in construction costs.

6. Because of the deprivation of his property rights, as alleged above, Mr. Stewart also has also incurred costs for obtaining soil testing; and waiver application costs for which he seeks reimbursement as compensatory damages.

7. Because of the deprivation of his property rights, as alleged above, Mr. Stewart is required to carry insurance on his travel trailer. He is seeking reimbursement of the cost for such insurance on a monthly basis as compensatory damages.

8. Because of the deprivation of his property rights, as mentioned above, Mr. Stewart has lived in a travel trailer and had to rent a storage unit

large enough for the majority of his family's personal belongings. He is seeking reimbursement for the cost of the monthly rental for storage facility over the period he is forced to keep his personal belongings in the facility and for the storage shed that he installed on his property to store his belongings and only installed due to the actions of Brevard County. Mr. Stewart has also had to pay a pump-out service for his sewage generated in his travel trailer that he would not have incurred but for the actions of the County.

9. Because of the deprivation of his property rights, procedural due process violations, and arbitrary, capricious actions, including the County's shockingly deliberate disregard of its own ordinances; application of inapplicable ordinances; and *de facto* amendment of existing ordinances directed at Mr. Stewart, as described in this Complaint, Mr. Stewart has also experienced emotional pain, stress, anxiety, frustration, and mental anguish for which he seeks compensatory and consequential damages.

E. That the Court issue its permanent and mandatory injunction mandating that the County follow its ordinances, specifically §62-1188 and Chapter 22 of its Code by recognizing Mr. Stewart's parcel to be either a lot of record or a "non-conforming lot of record" with access via a statutory way of

necessity over the access road, and compelling the County to accept and process, in good faith, Mr. Stewart's application for a single family residence building permit on the Property.

F.  Mr. Stewart seeks such other damages and remedies as may be determined by the Court.

G.  Mr. Stewart has contracted with the below signed law firm and agreed to pay reasonable attorney's fees pursuant to the terms of that contract, for which he seeks payment by the Defendant County in accordance with 42 U.S.C. §1988, together with the costs of filing, court costs, expert witness fees and other reasonable costs incurred in litigating these claims.

**<u>Respectfully submitted,</u>**

Dated: July 14, 2025

/s/ W. Nathan Meloon

W. Nathan Meloon, Esq.
Florida Bar No.: 1004623
Scott Knox, Esq.
Florida Bar. No.:211291
**WIDERMAN MALEK, PL**
1990 W. New Haven Avenue, Suite 201
Melbourne, Florida 32904
Telephone:  321-255-2332
Facsimile:  321-255-2351
Nmeloon@USLegalTeam.com
SKnox@USLegalTeam.com
ATellone@USLegalTeam.com
Julie@USLegalTeam.com
Attorneys for Plaintiff
